ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| FERROVIAL CONSTRUCTION PR LLC<br><br>APELADA<br><br>V.<br><br>AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESETRUCTURA DE PUERTO RICO; ET. AL.<br><br>APELADA<br><br>V.<br><br>MUNICIPIO DE AGUADILLA<br><br>TERCERA DEMANDADA APELANTE | KLAN202100814<br><br>Consolidado con: | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm. K AC2016-0050<br><br>Sobre:<br><br>Incumplimiento de Contrato y Cobro de Dinero |
| FERROVIAL CONSTRUCTION PR LLC<br><br>APELANTE<br><br>V.<br><br>AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESETRUCTURA DE PUERTO RICO; ET. AL.<br><br>APELADA<br><br>V.<br><br>MUNICIPIO DE AGUADILLA | KLAN202100820 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm. K AC2016-0050<br><br>Sobre:<br><br>Incumplimiento de Contrato y Cobro de Dinero |

Panel integrado por su presidente, el Juez Figueroa Cabán, la Juez Brignoni Mártir y el Juez Ronda del Toro.

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de febrero de 2023.

Número Identificador
RES-SEN2021 _____

El Municipio Autónomo de Aguadilla (Municipio) y Ferrovial Construcción PR, LLC (Ferrovial) presentaron dos recursos de *Apelación* solicitando la revisión de la *Sentencia Sumaria* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante TPI). Mediante el referido dictamen se declaró *Ha Lugar* la *Demanda* de Ferrovial contra la Autoridad para el Financiamiento de la Infraestructura (AFI) y la *Demanda contra Tercero* de AFI contra el Municipio condenándose a éste último a pagar a Ferrovial $2,412,601.08 por gastos de operación extendida en la construcción del Paseo Real Marina en Aguadilla. El Municipio solicita que revoquemos la sentencia por entender que el foro de instancia se equivocó al interpretar el contrato que suscribió con la AFI para la referida construcción. [1] Ferrovial por su parte reclama que modifiquemos la sentencia a los fines de aclarar que la AFI es responsable directamente del pago de la cuantía establecida. [2] Mediante *Resolución* ordenamos la consolidación de ambos recursos.[3]

Luego de revisar detenidamente los recursos instados *modificamos* la sentencia apelada, y así modificada la *confirmamos* por los fundamentos que expondremos a continuación.

I

### A. Antecedentes

El Municipio desarrolló el Proyecto Paseo Real Marina, Fase I (proyecto). Se trata de un paseo peatonal en el frente marino del Municipio, con longitud aproximada de 1.5 millas, que incluye infraestructura en el frente marino, áreas recreacionales, quioscos de ventas y servicios sanitarios. El 16 de noviembre de 2010, suscribió con la AFI un contrato titulado *Acuerdo Interagencial para Proyecto Paseo Real Marina* (Acuerdo Interagencial).[4] En términos generales se acordó que la AFI proveería al Municipio la asistencia técnica necesaria para llevar a cabo el proyecto, incluyendo fase de subasta, contratación y administración durante la

---

[1] KLAN202100814.
[2] KLAN202100820.
[3] *Resolución* emitida el 30 de noviembre de 2021.
[4] *Apéndice* del recurso de *Apelación* del Ferrovial, págs. 774-779.

construcción. También se dispuso que el Municipio aportaría $11,493,092.00 para los gastos de construcción luego de que la AFI sometiera las certificaciones correspondientes y que la AFI no estaba obligada a efectuar ninguna aportación de fondos en esta etapa.

Luego de celebrar una subasta y adjudicar la buena pro a Ferrovial, la AFI suscribió un contrato denominado *AFI-Contractor Agreement, Contract No. 2011-001021* (contrato de construcción) con Ferrovial, el 7 de junio de 2011.[5] Conforme a los términos del contrato la AFI se obligó a pagar $11,707,389.00 por la construcción del proyecto, sujeto a reducciones y aumentos autorizados mediante órdenes de cambio. Ferrovial contaba con 546 días para alcanzar la terminación sustancial de la obra, contados a partir de la orden de comienzo, por lo que la fecha para la terminación sustancial fue fijada para el 17 de diciembre de 2012.

No obstante, varios eventos ocasionaron que la construcción del proyecto se retrasara por lo que Ferrovial solicitó una extensión en el término del contrato y en la fecha para alcanzar la terminación sustancial del proyecto. La AFI sometió al Municipio la orden de cambio correspondiente y el Municipio autorizó la extensión solicitada. El periodo para realizar el proyecto se aumentó por 896 días calendario adicionales a los originalmente pactados y se modificó la fecha de terminación sustancial al 31 de mayo de 2015.[6] Ferrovial solicitó a la AFI que se aumentara el precio del contrato para cubrir los gastos de construcción y de operación extendida incurridos a causa de los atrasos que no le eran atribuibles. La AFI informó al Municipio de la reclamación de Ferrovial.[7]

El 24 de julio de 2014, el Municipio presentó una *Demanda* contra AFI y Ferrovial por incumplimiento de contrato, daños y perjuicios.[8] Alegó que la demora en la terminación del proyecto fue causada por la

---

[5] *Apéndice* del recurso de *Apelación* del Ferrovial, págs. 583-773.
[6] Ferrovial alcanzó la terminación sustancial en dicha fecha. El Municipio aceptó la obra el 1 de junio de 2016 y en la actualidad posee control y operación del proyecto.
[7] *Apéndice* del recurso de *Apelación* de Ferrovial, pág. 518. Carta de la AFI al Municipio del 21 de agosto de 2013.
[8] *Municipio Autónomo de Aguadilla v. Autoridad para el Financiamiento de la Infraestructura y Ferrovial*; Civil Núm.: A AC2014-0090

negligencia de ambos demandados. A su juicio, Ferrovial no trabajó en toda su capacidad y redujo personal y la AFI permitió que el permiso del Cuerpo de Ingenieros de Estados Unidos (COE) se venciera, provocando la paralización de los trabajos. Entre los remedios solicitó que se condenara a la AFI al pago de las cuantías reclamadas por Ferrovial.[9]

Mientras el caso antes mencionado se ventilaba, el Municipio instruyó a la AFI a continuar con el Acuerdo Interagencial y a completar la evaluación de las reclamaciones presentadas por Ferrovial haciendo la salvedad de que no pagaría órdenes de cambio por las que no tuviera responsabilidad contractual.[10] Luego de someterse a un proceso de resolución de disputas la AFI y Ferrovial acordaron transar la reclamación por $2,264,925.18. La AFI informó el acuerdo al Municipio para que impartiera su aprobación y certificara la disponibilidad de fondos para sufragar la cuantía acordada.[11] El Municipio, por su parte, no aceptó la transacción y le informó a la AFI que en tanto los gastos reclamados surgieron por su atraso en renovar el permiso del COE, le correspondía cubrirlos.[12] La AFI le comunicó a Ferrovial que ante la falta de aprobación del Municipio no podría formalizar el acuerdo alcanzado.

**B. Hechos procesales**

El 4 de febrero de 2016, Ferrovial presentó la *Demanda* contra la AFI por incumplimiento de contrato y cobro de dinero. Alegó que, conforme a los términos del contrato de construcción la AFI era responsable de diseñar la obra y contar con los permisos y endosos requeridos, por lo que las demoras provocadas por la renovación del permiso del COE y por la mitigación de pintura con base de plomo, necesaria para obtener el Permiso General Consolidado, le eran atribuibles. Adujo que dicho atraso

---

[9] Mediante *Sentencia* del 11 de agosto de 2020, el TPI desestimó con perjuicio la demanda del Municipio tras concluir que los atrasos en la expedición del permiso fueron producto de la discreción del COE y como tal, no era imputable a la AFI. Esta determinación fue confirmada por este Tribunal de Apelaciones mediante *Sentencia* del 25 de agosto de 2021, la cual advino final y firme. (KLAN202000842).

[10] *Apéndice* del recurso de *Apelación* de Ferrovial, pág. 531. Carta del Municipio a la AFI del 18 de agosto de 2014.

[11] *Apéndice* del recurso de *Apelación* de Ferrovial, págs. 532-534. Carta de la AFI al Municipio, 17 de noviembre de 2015.

[12] *Apéndice* de *Alegato de la parte Apelada (AFI)*, pág. 116. Carta del Municipio a la AFI, 10 de diciembre de 2015.

ocasionó que incurriera en gastos administrativos por el periodo de tiempo extendido del contrato reclamando por ello la suma de $4,666,226.89 más $700,000.00 por concepto de honorarios de abogados.

La AFI contestó la demanda y presentó una *Demanda Contra Tercero* contra el Municipio por incumplimiento de contrato, daños y perjuicios. Alegó que en virtud del Acuerdo Interagencial el Municipio era el único responsable por los costos de construcción del proyecto, incluyendo las sumas reclamadas por Ferrovial. Argumentó que actuó de manera diligente y de conformidad a los poderes delegados por el Municipio en el mandato constituido mediante el Acuerdo Interagencial y que el Municipio ratificó las actuaciones y acuerdos alcanzados con Ferrovial al aceptar el proyecto sin objeción. Planteó, además que, de condenársele al pago de las sumas reclamadas por Ferrovial, el Municipio le es directamente responsable al demandante de dichas sumas ya que constituyen un costo reembolsable bajo la doctrina del contrato de mandato o un enriquecimiento injusto.

El Municipio contestó la demanda contra tercero alegando en esencia que la AFI venía obligado a responder por las sumas reclamadas por Ferrovial toda vez que la extensión en el término del contrato se debió a su negligencia en la renovación del permiso del COE. También arguyó que la AFI se obligó a indemnizarle por cualquier daño que surgiera de su relación contractual con el contratista.

Las partes sometieron un *Informe Preliminar de Conferencia con Antelación a Juicio.*[13] Entre otros asuntos, informaron al tribunal que la AFI y Ferrovial continuaban negociando algunas de las reclamaciones originales sobre las que no habían llegado a acuerdos aún. Culminadas las negociaciones las partes presentaron un *Informe Enmendado de Conferencia con Antelación al Juicio* en el cual incluyeron las cuantías acordadas para las reclamaciones pendientes.[14] A su vez, el informe incluyó sesenta y cuatro (64) estipulaciones de hechos.

---

[13] *Apéndice* del recurso de *Apelación* de Ferrovial, págs. 1096-1157. Sometido el 6 de febrero de 2019.

[14] *Apéndice* del recurso de *Apelación* de Ferrovial, págs. 1034-1093. Sometido el 20 de noviembre de 2019.

Con posterioridad, todas las partes presentaron mociones de sentencia sumaria, sus correspondientes oposiciones, réplicas y dúplicas. Luego de evaluar los argumentos esbozados el TPI emitió la *Sentencia* apelada de manera sumaria por entender que no había controversia sobre hechos pertinentes pendiente por dilucidar. En ésta, el tribunal *a quo* concluyó que el Acuerdo Interagencial entre el Municipio y la AFI es un contrato de mandato de cuyos parámetros la AFI no se excedió. Intimó, además, que en tanto la AFI asumió una obligación contractual con Ferrovial mediante el contrato de construcción, es la AFI quien tiene la obligación de pagar a Ferrovial. Sin embargo, considerando que la AFI suscribió dicho contrato por mandato del Municipio, resolvió que el dinero para el pago de las reclamaciones tiene que provenir del Municipio, pues éste se obligó aportar los costos de construcción según el Acuerdo Interagencial. Con ello, condenó al Municipio a pagar $2,412,601.08, más el interés legal aplicable, las costas y los gastos.[15]

En desacuerdo con la *Sentencia* el Municipio y Ferrovial presentaron las apelaciones que aquí nos ocupan y que, a solicitud de las partes, ordenamos consolidar. La AFI por su parte se opuso a ambos recursos.

### C. Apelación del Municipio

En su recurso el Municipio formuló los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al ignorar el texto claro del contrato suscrito entre AFI y el [Municipio] donde se limita la responsabilidad del [Municipio] al pago de una cantidad específica exclusivamente por concepto de construcción de obras.
>
> Erró el Tribunal de Primera Instancia al ignorar las disposiciones contractuales relativas al relevo de responsabilidad suscrito por AFI a favor del [Municipio] por daños sufridos por terceros.
>
> Erró el Tribunal de Primera Instancia al imponerle al [Municipio] la obligación de compensar a Ferrovial la suma de $2,412,601.08 basado en una estipulación, no aceptada por el [Municipio], tras un proceso de mediación en el que el [Municipio] no participó.

---

[15] Inicialmente el TPI emitió *Sentencia* ordenando al Municipio el pago de $2,068,034.89. Sin embargo, a solicitud de Ferrovial, el tribunal emitió una *Sentencia Nunc Pro Tunc* a los únicos fines de corregir que la cuantía adeudada es $2,412,601.08.

Con respecto al primer error sostuvo que en el Acuerdo Interagencial se acordó que el Municipio sería responsable de un *lump sum* de $11,493,092.00 para cubrir exclusivamente los gastos de construcción del proyecto ya que la AFI asumiría los riesgos de la operación. No se pactó que el Municipio asumiría la responsabilidad por atrasos en la obra sufridos por Ferrovial, con quien no tiene relación contractual alguna. En esa línea arguyó, que no existe vínculo entre la tardanza que alegadamente provocó los daños a Ferrovial y algún acto u omisión por parte del Municipio. Enfatizó que, de conformidad con las normas aplicables a la contratación gubernamental, cualquier responsabilidad adicional que se le pretenda imponer tenía que ser consentida y pactada por escrito.

En cuanto al segundo error, sostuvo que según el párrafo undécimo del Acuerdo Interagencial la AFI liberó al Municipio de toda responsabilidad frente a sus contratistas, como Ferrovial, por daños sufridos por reclamaciones que no estén relacionadas al pago de lo pactado.

Sobre el tercer error sugirió que el Acuerdo Interagencial suscrito con la AFI es un contrato de mandato y como tal, la AFI no tenía autoridad para obligar al Municipio en asuntos que excedieran dicho contrato. Por lo que, a su juicio, el acuerdo alcanzado por la AFI con Ferrovial para que el Municipio asumiera los gastos reclamados es inoficioso y no vinculante, por haber traspasado los límites del mandato y por haber sido expresamente rechazado. Reiteró que, conforme al derecho aplicable, los municipios solo responden por las obligaciones que voluntariamente asumen en acuerdos legalmente vinculantes y por los daños extracontractuales que provoquen sus actos.

### D. Apelación de Ferrovial

Ferrovial por su parte alegó que el foro de instancia incidió en lo siguiente:

Erró el Honorable Tribunal de Primera Instancia al determinar que, aun cuando AFI es responsable de pagar a Ferrovial la suma acordada, dicha obligación

queda supeditada a que el pago sea emitido por el [Municipio].

En esencia, Ferrovial solicitó que modifiquemos la sentencia a los efectos de aclarar que la AFI es responsable directamente de las cuantías reclamadas sin que ello dependa de que el Municipio le pague primero dicha suma. Según indica, la AFI, en calidad de dueño, suscribió un contrato para la construcción del proyecto en el que se obligó expresamente a reembolsarle los gastos incurridos por toda demora ocasionada por causas que no le fueran atribuibles. El proyecto se atrasó aumentando sus gastos operacionales, por lo que procede responsabilizar a la AFI del pago al que contractualmente se obligó, sin que ello este supeditado al pago por parte del Municipio.

Señaló que analizando el Acuerdo Interagencial entre la AFI y el Municipio bajo la figura del mandato con poder de representación, corresponde a la AFI pagar la cuantía reclamada. Esto ya que, en cumplimiento del mandato la AFI otorgó con Ferrovial un contrato obligándose expresa y directamente a responder por los atrasos en el proyecto.

En la alternativa sostuvo que aun considerando que el contrato entre AFI y el Municipio es un mandato sin poder de representación (en nombre propio del mandatario) como quiera la AFI le tendría que responder directamente. Considerando que, en un mandato sin poder de representación, en el que se ejecutan gestiones propias del mandante (Municipio), la obligación asumida por el mandatario (AFI) con el tercero (Ferrovial) no se desvanece.

## I. Alegato en Oposición de la AFI

La AFI alegó que los gastos de construcción que el Municipio se obligó a pagar mediante el Acuerdo Interagencial incluyen las reclamaciones de daños por atrasos en la obra de Ferrovial. Sostuvo además que el relevo de responsabilidad del párrafo undécimo del acuerdo no aplica, puesto que excluye reclamaciones que surgen por falta de pago del Municipio y como consecuencia del diseño. Sobre los acuerdos

alcanzados con Ferrovial indicó que el Municipio no las cuestionó durante el litigio por lo que, en este punto, ya no puede impugnarlas.

Sobre el error señalado por Ferrovial, la AFI alegó que el Acuerdo Interagencial suscrito con el Municipio es un contrato de mandato representativo directo de cuyos límites no se excedió. Planteó que su rol era gerencial e incluía celebrar una subasta, administrar el proceso de construcción y servir de agente pagador. En cambio, la obligación del Municipio como mandante siempre fue pagar los gastos de construcción, lo que incluye la compensación concedida por el TPI a Ferrovial. Indicó, en la alternativa que, aun tratándose de un mandato en nombre propio, no le corresponde pagar las reclamaciones de Ferrovial, pues en virtud del contrato de construcción solo podría reclamársele que emita los pagos de los gastos de construcción, no así, que aporte los fondos.

De manera similar sostuvo que Ferrovial siempre supo que el Municipio era el dueño del proyecto obligado a pagar los gastos de construcción y que la AFI actuaba en calidad de mandatario representativo sin ninguna obligación de aportar fondos. Argumentó que en el contrato de construcción se le denominó *owner* para propósitos de facilitar la comprensión del acuerdo. De otro lado, negó que en el caso aplicara la nivelación de la cuantía establecida a favor de Ferrovial, ya que, el mandato suscrito con el Municipio no establecía una obligación solidaria entre las partes para pagar los gastos del proyecto. A su vez descartó que aplique el reembolso, puesto que nunca adelantó pago alguno durante la construcción porque no tenía obligación de hacerlo.

Contando con el beneficio de la posición de todas las partes, resolvemos la controversia planteada de conformidad con el marco jurídico reseñado a continuación.

II

*A. Contratos en general y con entes gubernamentales*

Los contratos son una de las fuentes de obligaciones en nuestro ordenamiento.[16] Para que un contrato exista y obligue a las partes debe cumplir con los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato y (c) causa de la obligación que se establezca.[17] Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes por lo que se debe cumplir con el mismo.[18]

En nuestro ordenamiento rige el principio de autonomía contractual por lo que los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarias a las leyes, la moral y orden público.[19] Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley.[20] Por tanto, cuando un contrato es legal y válido, y no contiene vicio alguno, los Tribunales de Justicia no pueden relevar a una parte de su cumplimiento. *De Jesús González v. Autoridad de Carreteras,* 148 DPR 255 (1999); *Mercado, Quilinchini v. U.C.P.R.,* 143 DPR 610 (1997).

En general, la interpretación de los contratos se rige por el esquema dispuesto en nuestro Código Civil, teniendo presente en todo momento la intención de las partes.[21] Primeramente, se examinan los términos del contrato, de ser claros, se hace valer el sentido literal de lo allí dispuesto. Sin embargo, si lo consignado en el acuerdo aparenta ser contrario a la intención de las partes, prevalece esta última. *Savary v. Mun. Fajardo*, 198 DPR 1014, 1015 (2017). Como parte de este proceso, se examinan los actos contemporáneos y posteriores al acuerdo con el fin de verificar la

---

[16] Considerando que los contratos objeto de controversia fueron celebrados durante la vigencia del anterior Código Civil de 1930, analizaremos los errores planteados a la luz de dicha legislación y su jurisprudencia interpretativa. Esto de conformidad con el Art. 1812 del Código Civil de 2020.

[17] Art. 1213, Código Civil 1930; véase Art. 1237, Código Civil 2020, 31 LPRA sec. 9771.

[18] Art. 1044, Código Civil 1930; véase Art. 1233, Código Civil 2020, 31 LPRA sec. 9754.

[19] Art. 1207, Código Civil 1930; véase Art. 1232, 31 LPRA sec. 6141.

[20] Art. 1210, Código Civil 1930; véase Art. 1237, 31 LPRA sec. 9771.

[21] Arts. 1233 a 1241, Código Civil 1930; véase Art. 354, Código Civil 2020, 31 LPRA sec. 6342 (b).

intención de las partes. Finalmente, las disposiciones del contrato se interpretan de manera integrada, cónsona con los designios de los contratantes. *Íd.*

Por lo general los contratos serán obligatorios sin importar la forma en que se hayan celebrado. [22] Sin embargo, existen contratos cuyo otorgamiento tiene que efectuarse mediante instrumento público o privado para hacer efectivas sus obligaciones.[23] Ese es el caso de los contratos realizados con un ente gubernamental.

Para que los contratos otorgados por el Estado sean válidos y tengan efecto vinculante entre las partes, tienen que cumplirse varios requisitos formales y procesales*. Colón Colón v. Mun. de Arecibo*, 170 DPR 718, 726 (2007). El Art. 8 de la Ley de Contabilidad del Gobierno de Puerto Rico, 3 LPRA sec. 283g (a), dispone que los fondos autorizados para un año económico se aplicarán únicamente al pago de gastos en que se haya incurrido durante ese año o al pago de "obligaciones legalmente contraídas y debidamente asentadas en los libros durante dicho año". Esta ley define "obligación" como "[u]n compromiso contraído que esté representado por orden de compra, contrato o documento similar, pendiente de pago, firmado por autoridad competente para gravar las asignaciones, y que puede convertirse en el futuro en deuda exigible". Art. 3 de la Ley Núm. 230, 3 LPRA sec. 283b(k).

El Tribunal Supremo ha favorecido la aplicación de una normativa restrictiva en cuanto a los contratos entre un ente privado y el gobierno. *Vicar Builders v. ELA et al.*, 192 DPR 256 (2015); *Cordero Vélez v. Mun. de Guánica*, 170 DPR 237, 248 (2007); *Lugo Ortiz v. Municipio de Guayama*, 163 DPR 208, 215 (2004). A su vez, la Alta Curia ha señalado que los requisitos formales que se deben observar al contratar con un ente gubernamental son los siguientes: (1) que los contratos se reduzcan a escrito; (2) se mantenga un registro fiel con miras a *prima facie* establecer

---

[22] Art. 1230, Código Civil 1930; Art. 277, Código Civil 2020, 31 LPRA sec. 6161.
[23] Art. 1231, Código Civil 1930; Art. 1245, Código Civil 2020, 31 LPRA sec. 9792.

su existencia; (3) se remita copia a la Oficina del Contralor como medio de una doble constancia de su otorgamiento, términos y existencias, y (4) se acredite la certeza de tiempo, esto es, haber sido realizado y otorgado quince (15) días antes. *Vicar Builders v. ELA et al.*, supra; *CMI Hospital v. Depto. Salud*, 171 DPR 313, 320 (2007). Se exige el cumplimiento riguroso con cada uno de esos requisitos, ya que sirven como mecanismo de cotejo para perpetuar circunstancial y cronológicamente esos contratos y, así, evitar pagos y reclamaciones fraudulentas. *ALCO Corp. v. Mun. de Toa Alta*, supra, págs. 537-538.

Exigir que los contratos gubernamentales se reduzcan a escrito permite salvaguardar los intereses de las partes contratantes frente a un incumplimiento, permite la ordenada utilización de los fondos, evita la incertidumbre en la confección del presupuesto y hace posible la adecuada identificación de la partida contra la cual se harán los desembolsos públicos en cumplimiento con la ley. *Colón Colón v. Mun. de Arecibo*, *supra.* Conforme a ello, el cumplimiento con el requisito de que el contrato conste por escrito es indispensable para que el contrato tenga efecto vinculante entre las partes. *Vicar Builders v. ELA et al.*, supra.

Al momento de celebrarse los contratos objeto de controversia, la Ley de Municipios Autónomos, Ley Núm. 81 de 30 de agosto de 1991 (derogada), establecía en su Art. 8.016 las formalidades y consideraciones que rigen la contratación con los Municipios.[24]

### B. Contrato de Mandato

Bajo el Código Civil de 1930 el contrato de mandato se rige por los Arts.1600 al 1622. Se define el mandato como aquel contrato por el cual una persona se obliga a prestar algún servicio o hacer alguna cosa a nombre o por encargo de otra.[25] Puede ser expreso, constituido por instrumento público, privado o incluso, verbalmente, o tácito.[26] También puede ser general si solo comprende actos de administración o especial si

---

[24] Derogada y sustituida por el Código Municipal de Puerto Rico, Ley Núm. 107-2020, según enmendada.
[25] Art. 1600, Código Civil 1930; Art. 1401, Código Civil 2020, 31 LPRA sec. 10361.
[26] Art. 1601, Código Civil 1930; Art. 1405, Código Civil 2020, 31 LPRA sec. 10365.

conlleva efectuar actos de dominio tales como transigir, enajenar o hipotecar bienes.[27] Entre otras razones, el mandato se acaba cuando el mandante lo revoca a su voluntad o por la renuncia del mandatario.[28]

En cuanto a las obligaciones del mandatario se dispone que, en ningún caso, el mandatario puede traspasar los límites de su mandato, pero si ejecuta el mandato de una manera más ventajosa para el mandante, ello no se considera traspasar los límites. [29] El mandatario responde de los daños y perjuicios que se ocasionen al mandante de no ejecutar el mandato.[30] Al ejecutar el mandato debe apegarse a las instrucciones dadas por el mandante, más a falta de estas, hará todo lo que, según la naturaleza del negocio, haría un buen padre de familia.[31] El mandatario tiene que dar cuenta de sus operaciones al mandante.[32]

Sobre las obligaciones del mandante se dispone que debe cumplir todas las obligaciones que el mandatario haya contraído dentro de los límites del mandato. Sin embargo, en lo que el mandatario se haya excedido, no queda obligado el mandante sino cuando lo ratifica expresa o tácitamente.[33] El mandante debe anticipar al mandatario las cantidades necesarias para la ejecución del mandato, si éste último lo pide.[34] Además, el mandante debe indemnizar al mandatario de todos los daños y perjuicios que le haya causado el cumplimiento del mandato, cuando no ha mediado culpa ni imprudencia del mandatario.[35]

En nuestro ordenamiento se han reconocido dos tipos de mandato: *representativo indirecto* y *representativo directo*. *Zarelli v. Registrador*, 124 DPR 543, 552 (1989).

En cuanto al *representativo indirecto* el Art. 1608 del anterior Código Civil, establece que:

> Cuando el mandatario obra en su nombre propio, el mandante no tiene acción contra las personas con quienes el

---

[27] Art. 1604, Código Civil 1930.
[28] Arts. 1623-1624, Código Civil 1930.
[29] Arts. 1605 y 1606, Código Civil 1930.
[30] Art. 1609, Código Civil 1930.
[31] Art. 1610, Código Civil 1930.
[32] Art. 1611, Código Civil 1930.
[33] Art. 1618, Código Civil 1930; véase, Art. 325, Código Civil 2020, 31 LPRA sec. 6268.
[34] Art. 1619, Código Civil 1930.
[35] Art. 1620, Código Civil 1930.

mandatario ha contratado, ni éstas tampoco contra el mandante.

En este caso el mandatario es el obligado directamente en favor de la persona con quien ha contratado, como si el asunto fuera personal suyo. Exceptúase el caso en que se trate de cosas propias del mandante.

Lo dispuesto en este artículo se entiende sin perjuicio de las acciones entre mandante y mandatario. Art. 1608, Código Civil 1930 (derogado).

En *Zarelli v. Registrador,* supra, el Tribunal Supremo aclaró que el mandato representativo indirecto es aquel en el cual el mandatario, a nombre propio, celebra el negocio con el tercero, quien nunca conocerá la relación de. mandato. En este caso, el mandante no queda vinculado con el tercero, pues el mandatario carece del poder de representación. *Íd.* El mandatario es el obligado directamente por lo que, a su vez, será responsable de dolo y de culpa, sin perjuicio de las acciones que procedan entre el mandante y el mandatario.[36]

Por otro lado, en cuanto al mandato *representativo directo* el Art. 1616 del anterior Código Civil dispone que:

El mandatario que obre en concepto de tal no es responsable personalmente a la parte con quien contrata sino cuando se obliga a ello expresamente o traspasa los límites del mandato sin darle conocimiento suficiente de sus poderes. Art. 1616, Código Civil de 1930 (derogado).

En *Zarelli v. Registrador,* supra, el Alto Foro explicó que el mandato representativo directo el mandatario está facultado a representar al mandante. Es decir, el tercero conoce que el mandatario actúa por cuenta y a nombre del mandante-poderdante, convirtiéndose el mandatario, además, en apoderado. *Íd.* Cuando el mandatario actúa a nombre del mandante y así se lo revela y se conduce frente a terceros, éstos sólo tienen causa de acción contra el mandante, a menos que el mandatario se obligue a responder expresamente o traspase los límites del mandato sin darle conocimiento suficiente de sus poderes a los terceros. R. Vélez Torres, Curso de Derecho Civil: Contrato, San Juan, Ed. Revista Jurídica UIPR, 1990, T. IV, Vol. II, pág. 431. Si el mandatario se obliga

---

[36] Arts. 1617 y 1608, Código Civil 1930.

expresamente a responder frente a los terceros con quien contrata, lo que está haciendo es garantizar la obligación que el mandante contrae. *Íd.*

En su comentario del Art. 1.725 del Código Civil español, correspondiente al Art. 1616 de nuestro Código Civil de 1930, Manresa aclara lo siguiente:

> De ordinario, los apoderados no contraen obligación ninguna con aquellas personas con quienes contratan, si obran dentro de los límites de sus poderes. … Mas puede ocurrir, y de hecho ocurre, que el mandatario resulte obligado a la parte que con él contrate. ¿Cuándo sucederá esto? Los supuestos legales son dos:
> a) Que el mandatario contrate en su nombre personal.
> b) Que excediéndose de los límites de sus poderes, contrate como tal mandatario, sin dar conocimiento a la parte de los términos de su mandato y de las facultades que en su virtud le están conferidas. …
>
> <u>En la hipótesis primera, el mandatario puede resultar obligado con el tercero cuando, teniendo este mayor confianza en él que en su representado, crea la relación contractual a condición de que la garantice, bien de modo subsidiario, bien directamente, obligándose de un modo personal, sin perjuicio de su derecho a repetir (el mandatario) contra el mandante</u>. Aquí resulta obligado con el tercero, no porque haya traspasado los límites del poder, o porque sin traspasarlos hubiere hecho el contrato sin dar conocimiento a la parte de su calidad de mandatario. <u>La obligación que con ello contrae es puramente voluntaria, y por su propia libertad queda obligado, desligando jurídicamente al mandante de su relación con el tercero.</u>  (Énfasis nuestro). J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1972, T. XI, págs. 723-724.

En el Código Civil de 2020 el contrato de mandato se rige por los Arts. 1401-1415, 31 LPRA secs.10361-10403. Según le define como el contrato por el cual el mandatario se obliga a realizar uno o más actos jurídicos en interés del mandante. Sobre los tipos de mandato el Art. 1404, indica lo siguiente:

> El mandato puede conferir poder para representar al mandante. En este caso, el poder alcanza solamente los actos para los cuales ha sido expresamente conferido.
> Cuando el mandante no otorga poder de representación, el mandatario actúa en nombre propio, pero en interés del mandante, quien no queda obligado directamente frente al tercero, ni este respecto al mandante, pero ambos pueden subrogarse en las acciones que el mandatario tiene contra cada uno de ellos. Art. 1404, 31 LPRA sec. 10364.

**III**

**A.**

A modo de umbral, es preciso evaluar si en el presente caso procedía dictar sentencia sumaria en virtud de la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, y su jurisprudencia interpretativa. Veamos.

Ferrovial presentó una *Solicitud de Sentencia Sumaria* en la que en 70 párrafos ofreció una relación organizada de los hechos que a su juicio no hay controversia sustancial, con indicación a las páginas de los documentos en donde se establecen tales hechos.[37] En esencia, alegó que no existe controversia en torno a la procedencia y las cuantías de las partidas reclamadas y acordadas con la AFI, por lo que, solo restaba determinar a quién le corresponde pagar los daños sufridos debido a la demora en la ejecución de la obra, si a la AFI, al Municipio o a ambos solidariamente. Argumentó que, aunque entre la AFI y el Municipio se suscribió un contrato de mandato, le corresponde a la AFI responderle a Ferrovial en virtud del contrato de construcción suscrito entre ambos.

El Municipio presentó su *Moción de Sentencia Sumaria* en la cual incluyó una relación concisa y organizada, en 60 párrafos enumerados, sobre los hechos que a su juicio no hay controversia. A su vez, hizo referencia a las páginas en los documentos presentados donde se establecen tales hechos.[38] En síntesis, solicitó se desestimara la demanda contra tercero instada por la AFI en su contra, por cuanto no es parte del

---

[37] Exhibit 1: Contrato entre Ferrovial y AFI; Exhibit 2: General Conditions, Sec. 6.8 del Contrato entre AFI y Ferrovial; Exhibit 3: Informes de Conferencia con Antelación al Juicio, Sección III, Estipulaciones radicados el 6 de febrero de 2019 y el 20 de noviembre de 2019; Exhibit 4: Contrato entre Municipio y AFI; Exhibit 5: Transcripción de deposición de Ramón Hilerio, empleado y testigo del Municipio; Exhibit 6: Transcripción de la deposición del Ing. Nassin Tactuk, testigo de Ferrovial; Exhibit 7: Transcripción de la deposición de David González, empleado de Ferrovial; Exhibit 8: Carta de CMA (diseñador original del proyecto) al Cuerpo de Ingenieros de Estados Unidos (COE) del 15 de noviembre de 2011; Exhibit 9: Carta de AFI al Municipio del 9 marzo de 2015 y Moción del 21 de julio de 2020 presentada por AFI; Exhibit 10: Transcripción de deposición del Ing. Manuel Pérez; Exhibit 11: Addendum #5 de la Subasta del Proyecto; Exhibit 12: *Statement of Bidder* (Propuesta de Ferrovial); Exhibit 13 y 14: Cartas enviadas por AFI al COE del 14 de noviembre de 2011 y del 20 de noviembre de 2011.
[38] Exhibit 1: Informe enmendado de Conferencia con Antelación al Juicio, 20 de noviembre de 2019; Exhibit 2: Contrato entre el Municipio y AFI; Exhibit 3: Contrato entre AFI y Ferrovial; Exhibit 4: Carta de AFI a Ferrovial del 3 de enero de 2012, en esta se le indica a Ferrovial que en la fase de subasta AFI proveyó a todos los licitadores copia de los permisos y endosos disponibles, por lo que todos los licitadores tenían conocimiento de los permisos y endosos obtenidos y sus fechas de vigencia.

contrato de construcción suscrito entre la AFI y Ferrovial. Enfatizó que las reclamaciones de Ferrovial no son gastos de construcción propiamente y que es la AFI quien debe afrontar los costos que causó a Ferrovial la dilación en la obtención de los permisos de construcción.

La AFI se opuso a las mociones de sentencia sumaria de Ferrovial y del Municipio, y a su vez, presentó una solicitud de sentencia sumaria. Aceptó que los hechos materiales no estaban en controversia, pues tanto los hechos como los documentos esenciales para el caso se habían admitido por estipulación de las partes o mediante admisiones durante las deposiciones. Según indicó, el único asunto de derecho en controversia era determinar a quién le corresponde aportar el dinero para pagar las cuantías reclamadas por Ferrovial, si a la AFI o al Municipio. Ante ello presentó una relación concisa y organizada de 33 párrafos sobre hechos adicionales sobre los que a su juicio no existe controversia e hizo referencia a las páginas de los documentos en los que se establecen dichos hechos.[39] En apretada síntesis, sostuvo que el Municipio es quien debe emitir el pago por las reclamaciones de Ferrovial ya que es el propietario del proyecto y los gastos reclamados constituyen gastos de construcción. A su vez alegó que Ferrovial conocía de la existencia del contrato de mandato entre la AFI y el Municipio, según el cual Municipio es el dueño de la obra.

---

[39] Anejo 1: Sentencia del TPI en el caso Municipio v. AFI y Ferrovial; Anejo 2: Aviso de Subasta sometido por AFI; Anejo 3: Demanda de Ferrovial contra AFI; Anejo 4: Moción informativa sobre estipulaciones sobre las reclamaciones de Ferrovial, sus causas y valor; Anejo 5: Demanda contra tercero de AFI contra el Municipio; Anejo 6: Demanda de Municipio contra AFI y Ferrovial Anejo 7: Contestación a la demanda contra tercero del Municipio; Ajeno 8: Transcripción de la deposición de Nassin Tactuk, testigo de Ferrovial; Anejo 9: Informe de Conferencia con Antelación al Juicio, Sec. Estipulaciones; Anejo 10: Contrato entre AFI y el Municipio; Anejo 11: Transcripción de la deposición a Ramón Hilerio López; Anejo 12: Transcripción de la Deposición a Manual Pérez; Anejo 13: Transcripción de la deposición del Ing. Salim Laham, director Área de Ingeniería de AFI; Anejo 14: Transcripción de la deposición del Ing. Samir El Hage, perito de AFI; Anejo 15: Contrato entre AFI y el Municipio Primera Enmienda; Anejo 16: Contrato entre AFI y Ferrovial, Art. 1; Anejo 17: Contrato entre AFI y Ferrovial, Condiciones Generales (*Uniform General Conditions*); Anejo 18: Portada del *Instrucctions to Bidders* sometido por AFI durante proceso de subasta; Anejo 19: Permiso de Construcción Original; Anejo 20: Permiso de Construcción Renovación; Anejo 21: Concesión para el uso de la Aguas Territoriales, los Terrenos Sumergidos y la Zona Marítimo Terrestre sometido por el Departamento de Recursos Naturales; Anejos 22 y 23: Carta de la Ing. Michelle Matos, ingeniera de proyecto de Ferrovial, a AFI, con fecha del 15 de febrero de 2013 y con fecha del 13 de noviembre de 2014; Anejo 24: Minuta Extraordinaria del 1 de noviembre de 2013, reunión entre AFI y Ferrovial; Anejo 25: Carta enviada de AFI para el Municipio con fecha del 21 de agosto de 2013; Anejo 26: Carta enviada por AFI al Municipio 15 de agosto de 2014; Anejo 27: Carta del Municipio a AFI con fecha del 18 de agosto de 2014;

El Municipio se opuso a la solicitud de sentencia sumaria de Ferrovial y de la AFI. En esta, se allanó a que no existían hechos en controversia y ofreció aclaraciones e interpretaciones alternas de algunos de los hechos incontrovertidos propuestos por las partes. De manera similar, Ferrovial se opuso a la solicitud de sentencia sumaria de la AFI y del Municipio, no obstante, no expuso hechos que a su juicio estuvieran en controversia.

Luego de evaluar las mociones de sentencia sumaria y sus respectivas oposiciones, concluimos que las partes cumplieron con las formalidades procesales exigidas para presentar una moción de sentencia sumaria y su oposición. Además, luego de analizar los hechos incontrovertidos propuestos por las partes en unión con los documentos presentados en apoyo, consideramos que no hay controversia real sustancial en cuanto a los hechos esenciales y pertinentes, por lo que, solo resta examinar las interrogantes de derecho esgrimidas y dictar sentencia sumaria.

B

Nos corresponde realizar una revisión *de novo* para determinar si el TPI aplicó correctamente el Derecho a la controversia planteada. Véase *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 982 (2022). Esto es, a quién le corresponde sufragar los gastos de operación extendida incurridos por Ferrovial debido a los atrasos en el proyecto que no le son atribuibles, si al Municipio o a la AFI.

Según señalamos, mediante el contrato de mandato una persona llamada mandatario, se obliga a hacer alguna cosa por encargo de otra, denominada mandante. Al cumplir con su encomienda es común que el mandatario contraiga obligaciones con terceros. Ahora bien, los efectos de la obligación así contraída van a depender del tipo de mandato que el mandatario ejecute y de que no se exceda de los límites del mandato. Véase *Zarrelli v. Registrador*, supra.

En el mandato representativo indirecto, donde el mandatario actúa en nombre propio y no revela que actúa en representación de otra persona, surge una relación jurídica entre el mandatario y el tercero, de la que responde el mandatario. *Véase* Art. 1608, Código Civil 1930 (derogado). Por otro lado, si el mandato es representativo directo, donde el mandatario revela que actúa en nombre del mandante, de ordinario, el mandante queda obligado por los actos del mandatario cuando contrata con tercero. <u>Sin embargo, si al ejecutar este tipo de mandato el mandatario se obliga voluntaria y expresamente con el tercero o si se excede de los límites del mandato sin ofrecer conocimiento claro de sus poderes, el mandatario queda obligado, desligando jurídicamente al mandante de su relación con el tercero.</u> *Véase*, Art. 1616, Código Civil 1930 (derogado).

Por su importancia para el caso conviene transcribir, en lo aquí atinente, las cláusulas y condiciones del Acuerdo Interagencial suscrito entre el Municipio y la AFI.[40]

> PRIMERO: La AFI realizará el proyecto conocido como Fase I del Pase Real Marina.
>
> SEGUNDO: El proponente y desarrollador de este Proyecto es el MUNICIPIO en coordinación con la AFI.
>
> TERCERO: …
>
> CUARTO:   La AFI le proveerá al MUNICIPIO toda la asistencia técnica necesaria, la cual incluye, pero no se limita, al Asesoramiento Técnico, Evaluación y Estudios Ambientales, Fase de Subasta y Contratación y Fase de Construcción para llevar a cabo el PROYECTO.   A esos fines, la AFI, en acuerdo con el MUNICIPIO, seleccionará, entre otras cosas, las firmas que tendrán a su cargo la ingeniería, la gerencia de construcción, los estudios ambientales y económicos y cualquier otro profesional especializado que se requiera por la complejidad del PROYECTO, para la ejecución de las obras de construcción.
>
> QUINTO: … Durante la vigencia del Acuerdo, el MUNICIPIO aportará al desarrollo de PROYECTO (Fase I del Paseo Real Marina) la cantidad de ONCE MILLONES, CUATROCIENTOS NOVENTA Y TRES MIL, NOVENTA Y DOS DÓLARES ($11,493,092.00) para ser utilizados exclusivamente para los gastos de construcción, mediante el método de transferencia, luego que AFI someta las certificaciones correspondientes. …
>
> El MUNICIPIO pagará a la AFI, en el término de treinta (30) días a partir de que sea recibida la certificación correspondiente, mediante transferencia electrónica a la

---

[40] Apéndice del recurso de *Apelación* presentado por Ferrovial, págs. 774-779.

cuenta del Banco Gubernamental de Fomento…, para sufragar los costos del PROYECTO.

...

El MUNICIPIO efectuará gestiones necesarias para identificar los fondos requeridos para sufragar los costos relacionados a la gerencia e inspección del PROYECTO, y posterior a esto le notificará a la AFI para que proceda a contratar los servicios de gerencia e inspección del PROYECTO.

…

DÉCIMO: La AFI se compromete a asegurarse que el Contratista cumpla con todos los términos establecidos en este Acuerdo y será responsable de indemnizar al MUNICIPIO de ocurrir cualquier daño a estos que pueda surgir como resultado del incumplimiento por parte del Contratista con cualquiera de las disposiciones de este Acuerdo o como resultado de la relación entre el contratista y la AFI. Asimismo, resarcirá al Municipio por cualquier daño que se ocasione a sus instalaciones por negligencia del Contratista o de cualquier persona natural o jurídica actuando en su representación o bajo su control.

UNDÉCIMO: La AFI releva al Municipio de toda reclamación que se instara entre la AFI y cualquiera de sus contratistas y subcontratistas, excepto que la reclamación surja como consecuencia del diseño del Proyecto y de la falta de pago y/o identificación de fondos por parte del Municipio.

…

DECIMOSEXTO: La AFI y el MUNICIPIO acuerdan expresamente que ninguna enmienda a este Acuerdo u orden de cambio que se efectúe con relación a los trabajos pertinentes al PROYECTO, se entenderá como una novación contractual, a menos que ambas partes pacten específicamente lo contrario por escrito.

…

DECIMONOVENO: El MUNICIPIO asumirá la operación del PROYECTO inmediatamente después de construido y que la AFI le haya entregado los endosos finales, incluyendo el permiso de uso para su operación.

…

VIGESIMOPRIMERO: La AFI no viene obligada a efectuar ninguna aportación de fondos al PROYECTO en estos momentos. Los fondos a utilizarse para sufragar los costos de construcción del PROYECTO provienen exclusivamente de las aportaciones del Municipio de Aguadilla al PROYECTO.

Del precitado acuerdo se desprende que el Municipio y la AFI suscribieron un contrato de mandato. Así, el Municipio en calidad de mandante, le encargó a la AFI, en calidad de mandatario, que le ofreciera la asistencia técnica y administrativa necesaria para realizar el proyecto de construcción del Paseo Real Marina. El Municipio por su parte se obligó a sufragar los costos de la construcción.

Se trata de un mandato representativo directo, pues según surge del texto del acuerdo el Municipio facultó a la AFI para que en representación suya celebrara la subasta correspondiente, otorgara los contratos necesarios para la construcción del proyecto y pagará a los contratistas con el dinero que el Municipio le aprobara. Cónsono con ello, en varios de los documentos sometidos por la AFI a los licitadores se indica que ésta convocaba la subasta en representación del Municipio.[41] Así se reconoce en la primera sección del contrato de construcción suscrito entre la AFI y Ferrovial.[42] Además, Ferrovial sabía que el dinero para sufragar los costos del proyecto provenía del Municipio y que el pago por los gastos acordados con la AFI por el atraso en el proyecto dependía de la aprobación del Municipio. [43]

Tal cual discutido, la normativa general exigiría que el Municipio, en tanto mandante, responda ante terceros (Ferrovial) de las obligaciones contraídas por el mandatario (AFI) que actúa dentro de los límites de un mandato de representación directa. Sin embargo, el escenario es distinto cuando el mandatario se excede de las facultades concedidas en el mandato o cuando se obliga expresamente a responder, pues en tal caso responde el mandatario, subsidiaria o directamente, según haya convenido con el tercero. Véase, J.M. Manresa y Navarro, *op. cit.*

De los documentos que surgen del expediente se concluye que, al suscribir el contrato de construcción con Ferrovial, la AFI actuó conforme a las facultades concedidas por el Acuerdo Interagencial. El Municipio le encargó, entre otros extremos, a suscribir el contrato de construcción con la firma de construcción seleccionada en la subasta. La AFI así lo hizo. Al cumplir con ese mandato la AFI fue diligente en informar al Municipio de

---

[41] Aviso de Subasta, *Instructions to Bidders,* Permiso de Construcción expedido por ARPE, *Apéndice* del recurso de *Apelación* presentado por Ferrovial, págs. 333-335; 500; 504-505.

[42] The parties acknowledge that the following facts form the background of this Agreement:
    1.1.1    Pursuant to the Enabling Act, AFI has entered into an Interagency Agreement (2011-000724) with the Municipality of Aguadilla dated on November 16th, 2010 (the "Agreement"). In accordance with the Agreement, AFI provides assistance to the above Municipality by undertaking an implementing certain projects and activities.
    1.1.2    One such project is "Paseo Real Marina" (the "Project").

[43] *Apéndice* del recurso de *Apelación* presentado por Ferrovial, pág. 513.

las posibles consecuencias del retraso en el proyecto para su oportuna mitigación. En representación del Municipio sostuvo un proceso de resolución de disputas con Ferrovial para establecer la procedencia de las cuantías reclamadas. Incluso, a pesar de la demanda por incumplimiento de contrato que instara el Municipio en su contra, no renunció a su mandato y entregó el proyecto al Municipio en el término acordado.

Ahora bien, al evaluar el contenido del contrato de construcción es forzoso concluir que la AFI se obligó expresamente a responderle a Ferrovial por los gastos de operación extendida incurridos por los atrasos a la obra que no le fueran atribuibles. Veamos.

El contrato de construcción suscrito entre la AFI y Ferrovial incluye el documento principal, *Uniform General Conditions* y *Sumplementary Conditions*, entre otros documentos. [44] La sección 1.1.1.53 de las *Suplementary Conditions* que enmiendan las *Uniform General Conditions*, dispone que para propósitos de dicho contrato *owner* es la AFI.[45] Por otra parte, la sección 7.5 del contrato principal de construcción establece que la AFI respondería a Ferrovial solo por las obligaciones expresamente asumidas en dicho contrato, al indicar que "*[i]n no event shall AFI be liable to the Contractor except for obligations expressly assumed by AFI under the Contract Documents*".[46] A tales efectos, la sección 9 de los *Uniform General Conditions* estipula bajo qué circunstancias la AFI respondería a Ferrovial debido a atrasos en la obra, a saber:

9.3 Delays and Extensions of Time

9.3.1   No extension of the Contract Time will be allowed for any reason except as provided below:

9.3.1.1 If satisfactory fulfillment of the Contract with authorized extension and increases requires the performance of Work in greater quantities than those set forth in the

---

[44] Apéndice del recurso de *Apelación* presentado por Ferrovial, págs. 583-773.
[45] Apéndice del recurso de *Apelación* presentado por Ferrovial, pág. 725.
    1.1.1.53 Owner – The Owner is the Department, Agency, Public Corporations, or any other instrumentality of the Commonwealth of Puerto Rico as identified in the Agreement and is referred to throughout the Contract Documents as if singular in number and masculine in gender. The term Owner means the Owner or his authorized representative. It shall also mean any person, or entity, named as such in the Contract Documents. For purposes of this contract, Owner shall mean AFI, its successors and assigns.
[46] Apéndice del recurso de *Apelación* presentado por Ferrovial, pág. 599.

proposal so that the total final payment is greater than the total original Contract Price, then the time allowance will be equitably adjusted taking into account the amount and difficulty of additional Work and only if the scope of the Work is increased or the critical path of the Project Schedule is affected.

[…]

9.3.1.4 In case of delays or interruptions to the Work cause by any act of the Owner, or by any separate Contractor employed by the Owner or by any other cause not attributable to the fault or negligence of the Contractor, then the Contract Time shall be equitably adjusted.

9.3.1.4.1 The Project reasonable fixed overhead cost incurred by the Contractor due to the time extension caused by the acts described in Article 9.3.1.4, will be reimbursed to the Contractor by the Owner. (Énfasis nuestro).[47]

De los términos del contrato de construcción antes citados se desprende que la AFI se obligó expresamente a reembolsar a Ferrovial los gastos razonables de operación extendida en los que incurriera debido a atrasos que afectaran la fecha de terminación del proyecto y que no fueran atribuibles a la culpa o negligencia de Ferrovial. Al obligarse, en calidad de dueño, la AFI garantizó la obligación que en cumplimiento con el mandato contrajo con Ferrovial. Véase, Vélez Torres, *op. cit.*

La obligación asumida por la AFI es además directa, pues los términos del contrato de construcción no la condicionan a que el Municipio no respondiera. Es decir, la AFI asumió una obligación de responder directamente a Ferrovial independientemente de la posición del Municipio al respecto. Esa fue la representación que la AFI le hizo a Ferrovial, quien anticipando la posibilidad de eventos que atrasaran la fecha de terminación del proyecto, consintió al contrato de construcción confiando en que la AFI se haría cargo de los gastos de operación extendida cuando la razón del atraso no le fuera atribuible.

En vista de lo anterior, durante las negociaciones entre la AFI y Ferrovial, la AFI aceptó que por eventos que no eran imputables a la culpa o negligencia de Ferrovial, la ejecución del proyecto se extendiera por 896 días calendario adicionales a los originalmente pactados.[48] Por

---

[47] Apéndice del recurso de *Apelación* presentado por Ferrovial, pág. 681.

[48] Según se estipuló en el Informe Enmendado: Renovación del permiso del COE, obtención del Permiso General Consolidado, realización de estudios y mitigación de

consiguiente, de conformidad con los términos del contrato de construcción la AFI responde ante Ferrovial por los gastos de operación extendida en los que incurrió por la extensión del contrato. La obligación expresamente contraída no depende de la posición del Municipio al respecto, por lo que Ferrovial tiene derecho a reclamar la cuantía en cuestión directamente a la AFI.

En este sentido, el error señalado por Ferrovial se cometió. Procedía declarar *Ha Lugar* la solicitud de sentencia sumaria de Ferrovial y condenar directamente a la AFI al pago de la cuantía reclamada.

C.

Nos corresponde ahora determinar si el Municipio es responsable a la AFI por la totalidad o parte de la cuantía reclamada por Ferrovial a la luz de las alegaciones de la demanda contra tercero. Veamos.

En su demanda contra tercero la AFI alegó que según el Acuerdo Interagencial el Municipio se obligó a aportar los costos de construcción. Planteó además que en la eventualidad de que se le condene a pagar las sumas reclamadas por Ferrovial, el Municipio le es directamente responsable de dichas sumas ya que constituiría un costo reembolsable bajo la doctrina del contrato de mandato o la del enriquecimiento injusto. El Municipio negó su responsabilidad, aduciendo que en tanto la AFI fue responsable del retraso ocasionado por la renovación del permiso del COE, estaba obligada a responder por los daños reclamados por Ferrovial por el atraso en la obra. Añadió que en virtud del párrafo décimo del Acuerdo Interagencial, la AFI le había indemnizado por cualquier daño que surgiera de su relación contractual con el contratista.

Para empezar, es preciso subrayar que la AFI fue exonerada de culpa o negligencia por la demora ocasionada al renovar el permiso del COE, en virtud de lo resuelto por la sentencia del TPI en el caso Civil Núm. A AC2014-0090, *Municipio de Aguadilla v. AFI*, confirmada por este

---

elementos con contenido de plomo; altas marejadas; y necesidad de llevar a cabo trabajos adicionales.

Tribunal en la sentencia emitida en el KLAN202000842, la cual advino final y firme. Por tanto, este es un asunto juzgado que no está ante nuestra consideración. De otro lado, según veremos a continuación, los gastos relacionados a la construcción del proyecto que el Municipio se obligó a aportar a la AFI, incluyen los costos de operación extendida provocados por el atraso.

Como es sabido, los contratos de construcción están sujetos a retrasos que pueden ser ocasionados por diversas razones. Es por ello que en nuestro ordenamiento se ha reconocido que un contratista tiene derecho a ser compensado por los gastos incurridos por atrasos en el tiempo de construcción originalmente pactado. *Levy v. Aut. Edif Públicos*, 135 DPR 382, 390 (1994). A esos efectos, se conoce como *extended project [field] overhead* "the costs associated with operating at the project site during the delay period, a direct cost of the work". R. Santana, S. Weinstein, *Advanced Construction Law in Puerto Rico*, National Business Institute, 2004, pág. 141. De ordinario, estos gastos, también conocidos como *jobsite overhead* incluyen: "project managers; superintendents; secretarial and clerical workers; timekeepers; office trailers; storage trailers; office equipment; office supplies; temporary electricity; temporary water; temporary sewer; telephone costs; sanitary facilities and trucks and automobiles." *W. Schwartzkopf, Jobsite overhead defined,* sec. 10.02 JW-CCD. En suma, el *extended project overhead* representa los costos adicionales en que incurre el contratista como resultado de haber continuado operando en área del proyecto durante el periodo de retraso. Se trata pues, de un costo directo del trabajo y, por tanto, es recobrable.

En atención a lo anterior concluimos que los gastos operacionales incurridos por Ferrovial como consecuencia de la extensión del proyecto, son parte de los costos de construcción que el Municipio se obligó a sufragar en el Acuerdo Interagencial.

Según los términos del acuerdo el Municipio habría de cubrir los gastos de construcción mediante el método de transferencia, luego de que

la AFI sometiera las certificaciones correspondientes. Sin embargo, no es menos cierto que cuando la AFI le informó al Municipio del acuerdo alcanzado con Ferrovial sobre los gastos reclamados por el atraso, el Municipio se negó a aprobarlo. Por tanto, no puede el Municipio alegar que no esta obligado a cubrir los gastos de operación extendida de Ferrovial porque la AFI no presentó la orden de cambio correspondiente. Esa posición es inaceptable, considerando además que el Municipio aceptó la extensión del proyecto y de su fecha de entrega sustancial cuando la AFI así lo solicitó. Tratándose de un retraso que no era imputable al contratista lo razonable es que fuera cubierto por el verdadero dueño de la obra como parte de los costos de construcción.

En esta misma línea, es claro que el relevo de responsabilidad invocado por el Municipio no aplica ya que la reclamación objeto de controversia surgió por la falta de pago del Municipio. Veamos. Del párrafo décimo del Acuerdo Interagencial antes citado, surge que la AFI se obligó a indemnizar al Municipio por los daños que surgieran "como resultado del incumplimiento por parte del Contratista … o como resultado de la relación entre el contratista y la AFI". A su vez, el párrafo undécimo añade que la AFI relevaría al Municipio de toda reclamación que se instara entre la AFI y cualquiera de sus contratistas "excepto que la reclamación surja como consecuencia … de la falta de pago y/o identificación de fondos por parte del Municipio".

En este caso Ferrovial reclamó los gastos de operación extendida incurridos debido al atraso del proyecto. Tal cual indicamos, estos gastos son parte de los costos de construcción que debían ser asumidos por el Municipio luego de que la AFI presentara la certificación correspondiente. Es luego de la negativa del Municipio en aprobar el acuerdo alcanzado, que Ferrovial opta por instar la demanda de epígrafe contra la AFI. De manera que, es indiscutible que la reclamación del contratista surgió como consecuencia de la falta de pago del Municipio y como tal, está excluida del relevo acordado por la AFI.

En consecuencia, los errores señalados por el Municipio no se cometieron. Procedía que el TPI declarara *Ha Lugar* la demanda contra tercero por haberse obligado el Municipio a pagarle a la AFI los costos del proyecto.

IV

Por los fundamentos antes expuestos *modificamos* la *Sentencia* apelada a los fines de disponer que Ferrovial puede reclamar directamente a la AFI el reembolso de los gastos de operación extendida y que el Municipio está obligado a responderle a la AFI por dicha cuantía por tratarse de costos de construcción. Así modificada, confirmamos la sentencia.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones